UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

TYLER EUGENE ADAMS, JR.          CIVIL ACTION NO. 11-cv-1504

VERSUS

CHESAPEAKE OPERATING, INC.          MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

**Introduction**

Tyler Eugene Adams, Jr. ("Plaintiff") owns an interest in land. He has not leased his mineral rights to anyone, but his land is included in a unit on which defendant Chesapeake Operating, Inc. ("Chesapeake") drilled a successful well. Plaintiff, as a "non-consent" owner of an unleased mineral interest, is entitled to share in the proceeds of production from the unit, but Chesapeake is entitled to first recover Plaintiff's share of the costs of drilling, completing, and equipping the well.

Plaintiff alleges that Chesapeake violated a Louisiana statute when it did not timely respond to his letter that demanded certain reports regarding the well and, thus, forfeited Chesapeake's right to collect Plaintiff's share of the well costs. Plaintiff also sought penalties and attorney fees pursuant to La. R.S. 31:212.21 - 212.23, but Judge Hicks granted partial summary judgment for Chesapeake and dismissed those claims. <u>Adams v. Chesapeake Operating, Inc.</u>, 2011 WL 6370512 (W.D. La. 2011).

Judge Hicks later referred the case to the undersigned pursuant to the consent of the parties and 28 U.S.C. § 636(c). The parties have filed competing motions for summary judgment (Doc. 28 and 33), and Plaintiff has filed a Motion to Strike (Doc. 40) aimed at some of Chesapeake's summary judgment evidence. For the reasons that follow, the motion to strike will be denied, and the summary judgment contest will be resolved in Chesapeake's favor.

**Relevant Facts**

Plaintiff is a certified professional landman with approximately 30 years experience working both independently and for a regional petroleum exploration company. He, his brother, and his sister are co-owners (1/3 each) of an approximately 107 acre tract located in DeSoto Parish. Plaintiff's son owns a nearby one-acre tract. The Commissioner of Conservation formed a 640-acre unit in 2009 that included both tracts.

Plaintiff and his brother sent Chesapeake a letter in February 2010 in an attempt to negotiate a lease of the three siblings' mineral interests in their tract, but no lease resulted. A few months later, in May 2010, Chesapeake began drilling a well on other property in the unit, and the well was completed in October 2010.

A Louisiana statute, La. R.S. 30:103.1, governs the reporting obligations that an operator has with respect to owners of unleased interests. If the operator permits 90 days from completion of the well and 30 additional days from receipt of a written notice by the owner calling the operator's attention to its failure to comply with Section 103.1, "such

operator or producer shall forfeit his right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well." La. R.S. 30:103.2.

Plaintiff, his siblings, and his son each sent Chesapeake essentially identical certified-mail letters in February 2011. Each letter began by referencing the well and identifying the writer as an unleased mineral owner whose interest lay within the unit. The letters stated:

> [P]ursuant to Louisiana RS 30:103.1, I am formally requesting the reports/information and statement required under this statute.
>
> This letter is to advise that you have failed to comply with the provisions of Louisiana RS 30:103.1.
>
> In accordance with the requirements of the statute, below is my name and mailing address: [information provided].

The certified-mail return receipt indicates that Plaintiff's letter was received in Chesapeake's mail room on February 12, 2011.

Chesapeake quickly responded to three of the four demand letters. It sent sworn, detailed, and itemized statements of the cost of the well to Plaintiff's two siblings and his son. None of those persons has complained about the timeliness, content, or sufficiency of the reports. Chesapeake did not, however, send a report to Plaintiff. Emily Miller, a Chesapeake official, testifies by affidavit that Chesapeake made an error when entering

Plaintiff's information into its computer system. The error prevented Plaintiff's name from appearing on a computer-generated list of unleased landowners who were owed reports.[1]

Plaintiff testified at his deposition that his siblings received a copy of the well cost report "within the time frame that they were supposed to get it" and that he learned of that "within a few days of my - - of my not getting one." Plaintiff testified that his son also received the report and called Plaintiff within a couple of days to tell him so.

Plaintiff testified that he did not call Chesapeake to tell them about the apparent oversight because: "Didn't feel that I owed them a call." But Plaintiff did eventually alert Chesapeake to the issue. It was when his attorney, 60 days after Chesapeake's receipt of Plaintiff's February 10 letter, sent Chesapeake a letter dated April 14, 2011 and argued that Chesapeake had failed to comply with the provisions of Section 103.1 and, therefore, Section 103.2 provided that Chesapeake had forfeited the right to demand contribution from Plaintiff for well costs.

Emily Miller testifies that the mistake in not sending Plaintiff a report was brought to the attention of Chesapeake's Land Department on April 25, 2011. Chesapeake sent

---

[1] Plaintiff moves to strike Ms. Miller's testimony as an irrelevant appeal to equitable considerations; he argues that the case should be decided based on an application of the statutes without regard to such matters. The court will decide the case based on the statutes' application to the undisputed facts, as suggested by Plaintiff, but Miller's affidavit will not be stricken. It does not affect the outcome of the case, but it lends a factual background. The court need not strike or disregard every fact not directly relevant to a decision.

Plaintiff a letter dated April 29, 2011 with the same cost report that had been sent to his relatives. Chesapeake showed the cost of the well as $8,410,176.50.

Plaintiff does not raise any substantive attack on the contents of the report that he received. His only complaint is that the report was not sent within 30 days of Chesapeake's receipt of his February 10 letter. The parties do not state how much Plaintiff would be obligated to pay toward the cost of the well, but based on his 1/3 share of approximately 107 out of 640 acres, his pro rata share appears to be about $468,000.

**Analysis**

Plaintiff takes the position that his February 10 letter obligated Chesapeake to respond within 30 days, failing which Chesapeake automatically forfeited its right to collect costs from Plaintiff's share of production. Chesapeake at first implicitly accepted Plaintiff's basic interpretation of the statutes and that its response was untimely. Chesapeake's defenses were that its lack of a response within 30 days of the February 10 letter should not cause it to incur a penalty because (1) Plaintiff had knowledge of the well cost report from his relatives and co-owners, (2) Chesapeake did not "permit" [make an express decision to allow] 30 days to pass without sending the report to Plaintiff, and (3) it would be inequitable to assess a penalty under these facts.

After briefing was completed, the court issued an order that described a different view of the statutes. The parties were allowed to file supplemental briefs on the issue. Chesapeake has now adopted the interpretation offered by the court. Plaintiff opposes it. After reviewing

the issue further, the court adopts the interpretation discussed in the order, which obviates the need to assess any of the defenses offered by Chesapeake.

When a statute "is clear and unambiguous and its application does not lead to absurd consequences, its language must be given effect, and its provisions must be construed so as to give effect to the purpose indicated by a fair interpretation of the language used." Katie Realty, Ltd. v. Louisiana Citizens Prop. Ins. Corp., 100 So. 3d 324, 328 (La. 2012). "[C]ourts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to and preserving all words can legitimately be found." Id. "Additionally, statutes that are penal in nature must be strictly construed." Id.

The statutes at issue provide, in relevant part, as follows:

La. R.S. 30:103.1

A. Whenever there is included within a drilling unit, as authorized by the commissioner of conservation, lands producing oil or gas, or both, upon which the operator or producer has no valid oil, gas, or mineral lease, said operator or producer shall issue the following reports to the owners of said interests by a sworn, detailed, itemized statement:

(1) Within ninety calendar days from completion of the well, an initial report which shall contain the costs of drilling, completing, and equipping the unit well.

(2) After establishment of production from the unit well, quarterly reports which shall contain [certain information about production, revenues, and expenses].

B. No operator or producer shall be required under the provisions of this Section to report any information which is not known by such operator or producer at the time of a report. However, the operator or producer shall report the required information to the owner of the unleased interest within thirty days after such information is obtained by the operator or producer, or in the next quarterly report, whichever due date is later.

C. Reports shall be sent by certified mail to each owner of an unleased oil or gas interest who has requested such reports in writing, by certified mail addressed to the operator or producer. The written request shall contain the unleased interest owner's name and address. Initial reports shall be sent no later than ninety calendar days after the completion of the well. The operator or producer shall begin sending quarterly reports within ninety calendar days after receiving the written request, whichever is later, and shall continue sending quarterly reports until cessation of production.

La. R.S 30:103.2

Whenever the operator or producer permits ninety calendar days to elapse from completion of the well and thirty additional calendar days to elapse from date of receipt of written notice by certified mail from the owner or owners of unleased oil and gas interests calling attention to failure to comply with the provisions of R.S. 30:103.1, such operator or producer shall forfeit his right to demand contribution from the owner or owners of the unleased oil and gas interests for the costs of the drilling operations of the well.

Section 103.1(A) states that the operator "shall issue the following reports to the owners" of unleased interests. Those reports include an initial cost report within 90 days from completion of the well and quarterly reports after establishment of production. If the statute ended there, it would be clear that such reports must be sent to *every* owner of an unleased interest in the unit, whether or not an owner had requested the reports or provided the operator his address.

But the statute does not end there, and subsections of a statute may not be read in isolation. The entire statute must be considered. State v. Louisiana Land and Exploration Co., __ So. 3d __, 2013 WL 360329, *21 (La. 2013); First Nat. Bank of Boston v. Beckwith Machinery Co., 650 So.2d 1148, 1155 (La. 1995). Subsection C states: "Reports shall be sent by certified mail to each owner of an unleased oil or gas interest *who has requested such*

Page 7 of 13

*reports in writing, by certified mail* addressed to the operator or producer." (emphasis added). A written request for reports "shall contain the unleased interest owner's name and address." Subsection C continues that initial reports shall be sent no later than 90 days after completion, and the operator shall begin sending quarterly reports "within ninety calendar days after receiving the written request, whichever is later ... ."

Section 103.2 provides that the operator shall forfeit his right to demand contribution for costs if he "permits ninety calendar days to elapse from completion of the well *and* thirty additional calendar days to elapse from date of receipt of written notice by certified mail from the owner or owners of unleased oil and gas interests *calling attention to failure to comply with provisions of R.S. 30:103.1*." (emphasis added). In the court's view, Plaintiff's February 10 letter could not have called to Chesapeake's attention any "failure to comply with" Section 103.1, because there would not have been any such failure (due to Plaintiff not making an earlier Section 103.1(C) request for reports).

Plaintiff was afforded the opportunity to file evidence that he sent a Subsection C request before his February 10 letter, but he did not do so. Rather, he argues that Section 103.1(A) mandated Chesapeake send him reports even before Plaintiff requested them. He urges that sending the operator a certified-mail letter, including his name and address, pursuant to Section 103.1(C), was required only if he wanted to receive the reports by certified mail rather than another means of delivery. That seems an unnatural interpretation of the statute, which perhaps could have been better written, and reduces Subsection C to

nothing but an elaborate method of requesting the notice be sent by certified mail. It is also inconsistent with a Louisiana appellate court's view of a former but similar version of the statutes. That decision will be discussed below.

Only a purely literal application of each sentence of the statute, in isolation and without regard to context or the other provisions of the statute, supports Plaintiff's view. As noted above, subsections of a statute may not be read in isolation. And in Louisiana "[t]he object of the court in construing a statute is to ascertain the legislative intent and, where a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result." First Nat. Bank of Boston, 650 So.2d at 1153, quoting Smith v. Flournoy, 115 So.2d 809, 814 (La. 1959). Plaintiff's interpretation leads to the absurd result that Section 103.1(C) exists only to allow an owner to insist on delivery by certified mail.

The court's reading of the statutes reasonably requires the operator be given formal notice under Section 103.1 of an unleased owner's address and his request for reports. That is reasonable because a check of title and similar records may not provide the operator a current mailing address for all owners in the unit. Some of the land records and addresses listed on them may be decades old. But once the operator receives a certified-mail request for records from the owner, along with the owner's name and address, the operator is obligated to provide reports under the statute. If the operator does not meet its Section 103.1 obligations, Section 103.2 allows the owner to then serve the operator with what is

essentially a notice of default, which is followed by a 30-day cure opportunity, before the imposition of a harsh financial penalty on the operator (and the grant of an unearned windfall to the owner).

There is little jurisprudence regarding the statutes. The Fifth Circuit recently interpreted the requirement that cost reports be "detailed," but offered nothing regarding to this dispute other than a reminder to apply the statutes as written. Brannon Properties, LLC v. Chesapeake Operating, Inc., 2013 WL 657781 (5th Cir. 2013). Another federal court emphasized the strict construction that must be afforded the penal statutes by dismissing a claim by a landowner who sent a request for reports by certified-mail rather than the registered mail required by former versions of the statutes. Browning v. Exxon Corp. 848 F.Supp. 1241 (M.D. La. 1994).

The parties cite Rivers v. Sun Oil Co., 503 So.2d 1036 (La. App. 2d Cir. 1987). Plaintiffs in that case first made demand under the statutes in 1978 and sent "repeated requests" thereafter before getting a response many months later. A violation was found and the penalty imposed. The issue in this case was not presented, but the owners' repeated requests would have complied with this court's interpretation. Rivers applied the original version of Section 103.1 before it was subdivided in 2001. Seeing the statute in that original format reinforces the interpretation applied here. It then provided:

> Whenever there is included within a drilling unit, as authorized by the commissioner of conservation, lands producing oil or gas, or both, upon which the operator or producer has no valid oil, gas or mineral lease, said *operator or producer shall report* to the owners of said interests, by a sworn, detailed,

itemized statement, the costs of the drilling operations of said unit within ninety calendar days from the completion of the well. *Reports shall be sent by registered mail to each owner of an unleased oil or gas interest who has requested such report and furnished his name and address* to the operator or producer. (Emphasis added).[2]

Another Louisiana decision, <u>White v. Phillips Petroleum Co.</u>, 232 So. 2d 83 (La. App. 3rd Cir. 1970), decided under the original versions of the statutes, did apply them as this court interprets. Section 103.2, at the time, stated that the cost penalty was imposed on the operator if it permitted to elapse (1) 90 days from completion and (2) 15 days (now 30) from receipt of written notice from the owner calling attention to failure to comply with Section 103.1. The <u>White</u> owners, in February 1967, sent a registered letter to the operator (1) reciting that in August 1960 they had requested the operator advise what it was doing with the share of production enuring to owners' land and (2) making demand that the owners be furnished within 10 days with an itemized statement of production from its land. The court said this "does not meet the strict requirements of the statute." It explained:

> *The statute expressly requires the owner of an unleased interest to request the Operator to furnish a sworn, detailed itemized statement showing the costs of drilling operations* on the land and penalizes the Operator *only* when it has failed to furnish such information within (1) 90 days from the completion of

---

[2] A similar construction can be seen in the current version of La. R.S. 30:103: "Operators taking or producing oil or gas from lands who do not market through a pipeline company shall report monthly to each owner of an oil or gas interest in the lands. These monthly reports shall show the amount of oil or gas produced from the lands during the previous calendar month, the amount disposed of, and the amount which has not been disposed of. *Reports shall be sent by certified mail to each owner of a royalty, oil or gas interest, who has furnished his name and address to the operator*." (Emphasis added).

> the well, *and* (2) fifteen additional calendar days from the date of receipt of written notice by registered mail from the owner of the unleased interest calling the Operator's attention to the fact that it has failed to comply with the provisions of that statute.
>
> Plaintiffs inquired only about production. At no time did they request a statement of costs, and at no time did they write the Operator pointing out that it had failed to comply with the statute. (Emphasis added.)

The reasoning is squarely in line with the court's reading of the current statutory framework and requirements to trigger the penalty. The owner must first request the reports. The operator is penalized only if (1) the operator does not timely respond to that request, (2) the owner then sends the operator a Section 103.2 notice of failure to comply, and (3) the operator does not remedy its mistake within thirty days after receipt of that notice.

<u>White</u> and the undersigned agree that Section 103.1 "expressly requires the owner of an unleased interest to request the Operator to furnish" a detailed cost reports. The first correspondence from Plaintiff that would constitute a Section 103.1 request for reports is the February 10, 2011 letter. The well had been completed several months earlier in October 2010, so the February 10, 2011 letter obligated Chesapeake to begin sending quarterly reports within 90 days after receiving it. A little more than 60 days after receipt, Chesapeake sent its April 29, 2011 correspondence that stated it included a sworn statement of costs, a "first initial report," and "future quarterly reports will follow at the end of each calendar quarter." Plaintiff has not complained that the substance of what Chesapeake provided did not satisfy the statute. His sole focus is on what he perceives to be a violation

of the timeliness requirement of the statute when he did not receive this information within 30 days of Chesapeake's receipt of his letter. The statutory framework defeats Plaintiff's claim given his lack of an earlier Section 103.1(C) request for notice.

**Conclusion**

Plaintiff's Motion to Strike (Doc. 40) and Motion for Summary Judgment (Doc. 28) are denied. Chesapeake's Motion for Summary Judgment (Doc. 33) is granted. A judgment in accordance with this ruling will be issued on a separate document.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of March, 2013.

_____
MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE